IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:04CV434-H

| | |
|---|---|
| K.A. and R.A.., on behalf of, C.A., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **MEMORANDUM AND ORDER** |
| ) | |
| CHARLOTTE-MECKLENBURG ) | |
| BOARD OF EDUCATION, ) | |
| ) | |
| Defendant ) | |
| ) | |

**THIS MATTER** is before the Court on the following motions and memoranda:

1. The Defendant's "Motion ... for Summary Judgment" (document #11) and "Brief ... in Support ..." (document #12), both filed January 31, 2005;

2. The Plaintiffs' "Cross-Motion ... for Summary Judgment" (document #16) and "Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Summary Judgment" (document #15), both filed April 4, 2005;[1] and

3. The Defendant's "Reply Brief ... [in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Cross-Motion for Summary Judgment]" (document #22) filed April 27, 2005; and

4. The Plaintiffs' "Reply ..." (document #23) filed May 18, 2005.

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority,

---

[1] Although a duplicate original of the Plaintiffs' Cross-Motion for Summary Judgment was not file stamped until April 14, 2005, their counsel has credibly represented that he initially submitted the motion to the Clerk's office on April 4, 2005, the date the Plaintiffs' principal brief was received and file stamped by the Clerk's office.

1

the undersigned will <u>deny</u> the Plaintiffs' Cross-Motion for Summary Judgment; <u>grant</u> the Defendant's Motion for Summary Judgment; and <u>affirm</u> the Decision of the North Carolina State Board of Education, as discussed below.

## I. PROCEDURAL HISTORY

On March 26, 2003, Plaintiffs K.A. and R.A. (individually, "Mr. A." and "Mrs. A."), the parents of C.A.,[2] their son who is autistic and then was four years-old and a student in a "cross-categorical preschool classroom" at the Defendant Charlotte-Mecklenburg Board of Education's ("the Board") Long Creek Elementary School, filed a petition with the North Carolina State Board of Education ("the State Board") requesting an administrative hearing and alleging that the Defendant had failed to provide C.A. with a "free appropriate public education" ("FAPE") as that term is defined by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1412(a)(1)(A). Additionally, the Plaintiffs contended that they were entitled to reimbursement for an at-home, one-on-one educational program offered to C.A. by the Center for Autism and Related Disorders ("CARD"), a private educational services provider.

The Plaintiffs' administrative complaint was heard initially by Chief Administrative Law Judge Julian Mann, III, during a hearing that included witness testimony, the introduction of numerous exhibits, and closing arguments by the parties' respective counsel.

On June 1, 2004, Chief Judge Mann issued a Level I Decision denying the Plaintiffs' claim.

The Plaintiffs timely appealed Chief Judge Mann's decision to a State Hearing Review Officer ("SHRO"), in this case, Dr. Joe D. Walters, a Professor of Special Education at Western Carolina University. After the parties briefed the case on administrative appeal, Dr. Walters issued

---

[2]As provided by the Individuals with Disabilities Education Act ("IDEA"),20 U.S.C. § 1400 <u>et. seq.</u>, the Plaintiffs filed this case using only their and their son's initials in order to preserve their privacy.

2

a Level II Decision affirming Chief Judge Mann's Level I Decision.

On September 3, 2004, the Plaintiffs filed this appeal as they are entitled to do under the IDEA.[3]  However, as the Defendant points out in its briefs, and as the Plaintiffs acknowledge in their Reply, they have not assigned error to any specific factual finding made by Chief Judge Mann or Dr. Walters.  Instead, Plaintiffs generally contend that there was insufficient evidence and analysis to support "the underlying administrative decisions to the extent that they 1) [find] Defendant's educational program ... appropriate and legally defensible; 2) fail to find any FAPE-depriving procedural ... violations; [and] 3) fail to find that the [CARD] ... program was appropriate ... and thus reimbursable."  "Plaintiffs' Reply ..." at 2 (document #23).

## II. FACTUAL BACKGROUND

C.A. was born on January 19, 1999, and sometime prior to January 25, 2002, was diagnosed with "mild autism."

Sometime near the end of January 2002, the Plaintiffs enrolled C.A., who was then three years-old, in a special education preschool classroom at Double Oaks Preschool in the Charlotte-Mecklenburg school system.  This enrollment was pursuant to an Individualized Education Program ("IEP") that had been developed by the Double Oaks IEP team on January 25, 2002.[4]   It is undisputed that the IEP took into account all then-current evaluative data concerning C.A.'s condition; that the IEP was to be effective for one calendar year; that the Plaintiffs attended and had direct involvement in the IEP meeting; and that they never challenged the IEP or its implementation

---

[3] Although the Complaint alleges a claim under N.C. Gen. Stat. § 115C-109, North Carolina's statutory equivalent to IDEA, the Plaintiffs have briefed only their federal claim.  Accordingly, their essentially identical state law claim is deemed abandoned.

[4] The record is not clear as to the exact composition of IEP teams that developed and monitored C.A.'s IEP, but during 2002, it consisted of, at a minimum, the Plaintiffs and C.A.'s teacher and speech therapist/pathologist at the respective schools he attended, as well as Valerie Todd, a supervisor who chaired IEP team meetings.

3

during Spring 2002.

To the contrary, in the four months that C.A. attended Double Oaks, he made significant progress on the goals and objectives of his IEP. His teacher and his speech-language pathologist, Robin Forstrom and Sally Wood, respectively, testified that they undertook to teach C.A. to perform a wide variety of tasks and that C.A., who attended the preschool full-time, progressed from a "zombie-like state" in January to participating in individual and group activities by the end of May 2002. It is undisputed that by the end of the school year, C.A. had already mastered 10 of the 18 academic goals in his IEP, that is, more than one-half of the goals that he was not expected to master fully until January 31, 2003.

Specifically, Ms. Forstrom, who had "years" of experience in teaching autistic children, explained how, "bit by bit," she saw C.A. adjust to the classroom, how he began to communicate, how he played and interacted with other students, and how he made choices about toys and played appropriately with them. At the hearing, she demonstrated how she used music boards and pictures to engage C.A. and her other students in language-rich learning, and described how she took advantage of incidental learning opportunities during each school day to engage C.A. with what interested him at that moment, helping him to progress on his goals and objectives. Ms. Forstrom also testified to the "reverse mainstreaming" that she did by bringing non-disabled peers into C.A.'s classroom on a regular basis, and that in May 2002, she was pleased with C.A.'s level of progress and that she believed that C.A. would have mastered the remaining IEP objectives had he continued in school for a full academic year. Finally, Ms. Forstrom testified that the Plaintiffs, as well as C.A.'s grandfather, praised her and made positive comments about C.A.'s progress during Spring 2002.

Similarly, Ms. Woods, C.A.'s speech pathologist at Double Oaks, testified how she worked

with C.A. in one-on-one settings and in small groups to help him progress on his speech goals. Ms. Woods prepared a report in October 2002 detailing C.A.'s progress and concluding that:

> Overall, I feel that C.A. made significant progress in speech therapy during the last quarter of school [the preceding school year at Double Oaks]. He was much more engaged and participating socially with communication skills. He continued to demonstrate a significant communication delay when compared to his age; however, he was much higher at the end of the year than when he first started attending the classroom.

Defendant's Administrative Exhibit 20.

Mrs. A. admitted during her testimony that she did not express dissatisfaction with C. A.'s tenure at Double Oaks until sometime in Summer 2002, that is, only after she was informed by the Double Oaks IEP team that C.A.'s progress through May 2002 made it unlikely that he would receive extended-school-year ("ESY") services during the summer and after she became familiar with the private, at-home CARD program.

Indeed, the Plaintiffs testified that during early-Summer 2002, they first learned about CARD, a for-profit service provider for children with autism. As described during the hearing by Cecilia Knight, a CARD supervisor, CARD implements one program for its clients: one-on-one applied behavior analysis ("ABA")[5] that is never altered to account for an individual child's specific needs. In CARD's program, a trainer, usually a college student with no background in the field of education, sits at a table with the student at home in a one-on-one setting and works on a pre-determined set of discrete tasks. Accordingly, the child does not interact with any other children in an instructional setting, but, instead, interacts only with his trainer.

Ms. Knight further testified that by sometime in June 2002, the Plaintiffs had enrolled C.A. in the CARD program and that by sometime in July 2002, C.A.'s Fall 2002 schedule had been set,

---

[5] Applied behavioral analysis ("ABA") approaches autistic children and learning from the standpoint of seeking to modify the autistic child's behavior, that is, as opposed to more traditional concepts of education and learning, the ABA model focuses on behavior modification.

5

that is, prior to ever discussing the CARD program with the IEP team or even raising questions about or objections to C.A.'s IEP, the Plaintiffs decided that C.A. would attend public school only two days per week for approximately two hours each day and then only because a CARD trainer was not available during those hours. On cross-examination, Ms. Knight conceded that she was not a trained educator and that she had no regular contact with C.A.

During the hearing, Dr. James Mulick, Ph.D., who the Plaintiffs offered as an expert in the fields of autism and applied behavior analysis, testified about the needs of autistic children generally and the appropriateness of a one-on-one ABA program for children such as C.A. However, Dr. Mulick did not limit this ABA training to an at-home setting. Moreover, Dr. Mulick admitted that he had never reviewed the IEP that had been developed by the Defendant for C.A. and, accordingly, he offered no testimony as to whether the IEP was deficient.

During the 2002-2003 school year, C.A. was assigned to a "cross-categorical preschool classroom" at Long Creek Elementary School, where his teacher and speech therapist were, respectively, Ericka Williams and Judy Campbell. In response to C.A.'s very limited attendance, Ms. Williams and Ms. Campbell decided to emphasize the speech and occupational therapy portions of C.A.'s IEP during the times he was in school, because those disciplines were not offered by CARD.

Concerning their present appeal, at an August 20, 2002 Long Creek IEP team meeting, the Plaintiffs and Ms. Knight objected to C.A.'s IEP, that is, they requested that C.A.'s instruction be converted to one-on-one, at-home ABA training like that offered by CARD. Essentially, and as the ALJ and SHRO found during the administrative proceedings, at this and subsequent IEP meetings conducted on September 12, October 3, October 9, and November 22, 2002, and January 29, 2003, the Plaintiffs sought the Defendant's agreement that the only appropriate educational setting for C.A.

6

was a one-on-one, at-home ABA setting and that to the extent that the Defendant was unable to offer such a service to C.A., the Defendant should reimburse the Plaintiffs for the cost of the CARD program.

There is conflicting evidence as to whether the Defendant ever incorporated any of the CARD goals and objectives into C.A.'s IEP, however, it undisputed that the IEP team refused to alter C.A.'s placement from a special education classroom setting to the one-on-one, at-home setting that the Plaintiffs sought. Although as the Plaintiffs point out repeatedly in their briefs, the IEP team never provided them with a written notice of the Defendant's rejection of the CARD proposal, there is no question that no later than the November 22, 2002 IEP meeting, the Plaintiffs were well aware that the Defendant was not going to provide C.A. with one-on-one, at-home ABA training, whether directly from CMS personnel or indirectly by reimbursing the Plaintiffs for the CARD program.

The ALJ and SHRO considered all of the above-recited evidence and concluded that the Defendant Board had developed a compliant IEP that correctly captured C.A.'s strengths and weaknesses; that the IEP had been appropriately implemented in the least restrictive environment; that C.A. had made solid progress in his initial preschool class from January through May 2002; that if his parents had not unilaterally and severely limited his attendance, C.A. most likely would have continued to make similar progress at Long Creek Elementary School during the 2002-03 school year; that the Plaintiffs' proposed CARD program had not been individually developed for C.A. and did not include speech or occupational therapy services; and that the CARD program did not constitute the least restrictive environment for educating C.A. For these reasons, Chief Judge Mann and Dr. Walters held that the Plaintiffs had failed to satisfy their burden of proof, that the Board's programming for C.A. was procedurally and substantively appropriate, and that the Plaintiffs were not entitled to reimbursement for the CARD program. It is from these determinations that the

Plaintiffs appeal.

## III. DISCUSSION

The Individuals with Disabilities Education Act ("IDEA") requires all states receiving federal funding for education to provide each child between the ages of three and twenty-one, who has a disability, with a free, appropriate public education ("FAPE"). See 20 U.S.C. § 1412(a)(1)(A); Board of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 192 (1982); and Wagner v. Board of Educ. of Montgomery County, Maryland, 340 F.Supp.2d 603, 605-06 (D. Md. 2004).

Moreover, the IDEA provides parents "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6). After parents present a complaint, they are entitled to an impartial due process hearing conducted by the State or local educational agency. See 20 U.S.C. § 1415(f)(1). If the parents are not satisfied with the findings and decision of that hearing, they may challenge it in district court. See 20 U.S.C. § 1415(i)(2)(A). At both the administrative and judicial review levels, the parents bear the burden of proof of establishing a violation of the IDEA. Barnett v. Fairfax County Sch. Bd., 927 F.2d 146, 152 (4th Cir. 1991).

On judicial appeal under the IDEA, a reviewing court is obliged to conduct a modified de novo review, giving "due weight" to the underlying administrative proceedings. MM ex rel. DM v. Sch. Dist. of Greenville County, 303 F.3d 523, 530-31 (4th Cir. 2002). "Findings of fact made in administrative proceedings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute [its] own notions of sound educational policy for those of local school authorities." Id. Moreover, "[i]n a two-tier administrative review situation, where a Hearing Officer and a Reviewing Officer have

reached the same conclusion, a reviewing court is obliged to accord greater deference to their findings." Id., citing Combs v. Sch. Bd. of Rockingham County, 15 F.3d 357, 361 (4th Cir. 1994).

The FAPE guaranteed by the IDEA must provide a disabled child with "meaningful access to the educational process," that is, it must be "reasonably calculated to confer some educational benefit" on the disabled child, and must also be provided in the least restrictive environment ("LRE") appropriate to the child's needs, with the disabled child participating to the "maximum extent appropriate" in the same activities as his or her non-disabled peers. Rowley, 458 U.S. at 207. For the purposes of this appeal, the parties agree that a class room placement is less restrictive than both at-home and one-on-one placements.

However, the IDEA does not require that a school district provide a disabled child with the best possible education, or that the education maximize each child's potential, but the educational benefit conferred must amount to more than trivial progress. Id. at 192; Hartmann v. Loudoun County Bd. of Educ., 118 F.3d 996, 1001 (4th Cir.1997); Reusch v. Fountain, 872 F.Supp. 1421, 1425 (D.Md. 1994).

To assure delivery of a FAPE, the IDEA requires a school district to provide an appropriate Individualized Education Program ("IEP") for each child determined to be learning disabled. 20 U.S.C. § 1414(d). The IEP is formulated by an IEP team consisting of the parents or guardian of the child, a representative of the school district, the child's regular and special education teachers, an individual who can interpret results of evaluations of the child, and, when appropriate, the child himself. 20 U.S.C. § 1414(d)(1)(B).

When a FAPE is not provided to a disabled student, the student's parents may place the child in a private school and then seek tuition reimbursement from the state. See Sch. Comm. of Burlington v. Dep't of Ed., 471 U.S. 359, 369-70 (1985). The parents will recover only if (1) the IEP

9

proposed by the state was inadequate to offer the child a FAPE, and (2) the private education services obtained by the parents were appropriate to the child's needs. Id. In other words, parents who enroll their child in a private school unilaterally "assume a double risk. First, they assume the risk that their child's IEP will be found adequate ... [s]econd, they assume the risk that though their child's IEP was inadequate, the alternative placement they chose for their child will not be deemed an adequate education either." CM ex rel. JM v. Board of Public Educ. of Henderson County, 184 F.Supp.2d 466, 488 (W.D.N.C. 2002). The standard used to evaluate whether a public school IEP is appropriate, the "some educational benefit" criterion, is also applied to private school programs when tuition reimbursement is claimed. See Florence County Sch. Dist. Four v. Carter, 950 F.2d 156, 163 (4th Cir. 1991).

The IDEA also provides a series of procedural safeguards "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to those decisions." MM ex rel. DM, 303 F.3d at 527. Among those safeguards, parents must be provided with written notice of a decision to change the IEP or to deny the parents' request for a change in the IEP. See 20 U.S.C. § 1415.

However, "the Fourth Circuit has made clear on numerous occasions that, to the extent that procedural violations do not actually interfere with the provision of a FAPE, these violations are not sufficient to support a finding that an agency failed to provide a FAPE." Wagner, 340 F.Supp.2d at 617, citing DiBuo v. Bd. of Educ. of Worcester County, 309 F.3d 184, 190 (4th Cir. 2002) ("under our circuit precedent, a violation of a procedural requirement of the IDEA ... must actually interfere with the provision of a FAPE before the child and/or his parents would be entitled to reimbursement relief"). Accordingly, where a child received a FAPE notwithstanding the procedural violation, the parents' claim for reimbursement must be denied. Accord CM ex rel. JM,

184 F.Supp.2d at 485 (where written notice was not sent but parents were aware of the information subject to the notice requirement, the violation was harmless).

Applying these legal principles to the record in this case, and according, as we must, due deference to Chief Judge Mann's and Dr. Walters' decisions, at step one of the analysis, the Plaintiffs have failed to meet their burden of proving that the IEP proposed by the Defendant was inadequate to offer C.A. a FAPE. Accord Sch. Comm. of Burlington, 471 U.S. at 369-70 (in order to recover private tuition reimbursement, parents must first establish that IEP was inadequate). Instead, the record shows that C.A. made more than trivial progress, that is, at a minimum, C.A. derived "some educational benefits" under the Defendant's IEP as required by the IDEA. Rowley, 458 U.S. at 207.

As discussed above, Ms. Forstrom and Ms. Woods gave detailed testimony describing both their efforts to implement the IEP's goals and objectives for C.A. and the demonstrable progress that he made. Regarding his social and environmental progress, his teachers testified that C.A. progressed from a "zombie-like state" in January 2002 to playing appropriately at times with both toys and other children by May 2002. Moreover, it is undisputed that at the end of four months in the Defendant's program, C.A. had reached more than half of his academic goals. Although Ms. Williams' and Ms. Campbell's opportunity to teach C.A. in Fall 2002 was severely limited due to the Plaintiffs' unilateral decision to send C.A. to school only four hours per week, as the ALJ and SHRO ultimately concluded, based on his earlier progress, it was reasonable to believe that had he continued full-time in school during the 2002-2003 school year, C.A. would have met the remaining goals on schedule, that is, by January 31, 2003.

Indeed, until the Plaintiffs learned of the at-home services offered by CARD, they had nothing but praise for the Defendant's efforts to educate C.A., none of the Plaintiffs' other witnesses

11

were ever able to articulate any shortcomings in the IEP, and their expert, Dr. Mulick, expressly stated that he had not reviewed the IEP and could not offer testimony as to whether it had been deficient.

In other words, rather than demonstrating any shortcomings in the IEP or the Defendant's efforts to implement it, the record supports Chief Judge Mann's and Dr. Walters' essential conclusion that during Summer 2002, the Plaintiffs developed a preference for the private, one-on-one, at-home placement offered by CARD, which is insufficient to satisfy the their burden of proving that C.A. was denied a "free appropriate public education" as required by the IDEA.

Finally at step one, because C.A., in fact, received a FAPE, the Defendant's failure to give formal written notice that the IEP would not be amended to an at-home, one-on-one placement does not provide a basis for granting the Plaintiff's their requested relief. Accord DiBuo v. Bd. of Educ. of Worcester County, 309 F.3d at 190 ("under our circuit precedent, a violation of a procedural requirement of the IDEA ... must actually interfere with the provision of a FAPE before the child and/or his parents would be entitled to reimbursement relief"); and Wagner, 340 F.Supp.2d at 617. This is particularly true where it is undisputed that the Plaintiffs had actual notice that C.A. would not receive one-on-one, at-home teaching at the Defendant's expense. Accord CM ex rel. JM, 184 F.Supp.2d at 485 (where written notice was not sent but parents were aware of the information subject to the notice requirement, the violation was harmless).

For these reasons, the Plaintiffs' have failed to meet their burden of proof at step one of the analysis and their appeal must and will be denied.

Additionally, assuming arguendo that the Plaintiffs had established that the Defendant failed to provide C.A. a FAPE, at step two of the analysis, they are unable to carry their burden of proving that the CARD program was the least restrictive, appropriate placement for C.A. Accord Sch.

Comm. of Burlington, 471 U.S. at 369-70 (in order to recover private tuition reimbursement, parents must establish at step two that the private education services obtained by the parents were appropriate to the child's needs); and Rowley, 458 U.S. at 207 (parents must select least restrictive environment ("LRE") appropriate to the child's needs).

As discussed above, Ms. Knight, a CARD supervisor who does not have formal training in the field of education and who had no regular contact with C.A., admitted that the CARD program, unlike the Defendant's IEP, did not take into account any of C.A.'s individual needs. Moreover, and in contrast to the certified, trained educators in the Defendant's classrooms, CARD's program was implemented by "trainers," typically college students with no background in education, who worked alone at a table with the autistic child. Although the Plaintiffs contend in their briefs that these trainers could ably instruct C.A., the Plaintiffs did not elect to present any of them as witnesses at the administrative hearing and, accordingly, neither the ALJ nor the SHRO had an opportunity, as they did with all of C.A.'s public school teachers, to evaluate their ability to teach autistic children. While Dr. Mulick testified that one-on-one ABA instruction was appropriate for C.A., he did not testify that such training must necessarily occur in the most restrictive, at-home setting. Finally, during the brief periods that C.A. spent at Long Creek during the 2002-2003 school year, Ms. Williams and Ms. Campbell emphasized the IEP components for speech and occupational therapy precisely because they were not included in the CARD program.

Although the Plaintiffs are undoubtedly sincere in their strongly-held belief that the at-home, one-on-one services offered by CARD are the best educational option for their son, the above-described evidence is sufficient to support the ALJ's and SHRO's decisions that the CARD program did not offer C.A. the least restrictive, appropriate education. Accordingly, the Plaintiffs have also failed to carry their burden of proof as to step two of the analysis and their appeal must be denied

for this reason as well.

## V. ORDER

**NOW THEREFORE, IT IS ORDERED:**

1. "Plaintiffs' Cross-Motion For Summary Judgment" (document #16) is **DENIED;** Defendant's "Motion for Summary Judgment" (document #11) is **GRANTED**; and the administrative decisions of the North Carolina State Board of Education are **AFFIRMED.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED, AND DECREED.**

**Signed: May 26, 2005**

_Carl Horn, III_
Carl Horn, III
United States Magistrate Judge